IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AMI SCARBROUGH,

PLAINTIFF,

V.

EDUCATION CORPORATION OF AMERICA,

DEFENDANT.

CIVIL ACTION NO.:

JURY TRIAL DEMANDED

# COMPLAINT

## I. JURISDICTION

1. This action for injunctive relief and damages is brought pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202, 29 U.S.C. § 2617(a)(2), and 42 U.S.C. § 12101 *et seq.* This is a suit authorized and instituted pursuant to the "Family and Medical Leave Act of 1993," 28 U.S.C. § 2601, *et. seq.* ("FMLA"). The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights and Defendant's violation of the Acts and for injunctive relief and damages.

## II. PARTIES

2. Plaintiff, AMI SCARBROUGH (hereinafter "Plaintiff"), is a citizen of the United States, and a resident of Jasper, Walker County, Alabama. Plaintiff was formerly employed by Defendant.

3. Defendant, EDUCATION CORPORATION OF AMERICA (hereinafter "Defendant"), is an entity subject to suit under 28 U.S.C. § 1331 and 29

1

U.S.C. § 2617(a)(2). Defendant employed at least fifty (50) persons for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. Defendant employed these fifty (50) employees within 75 miles of Plaintiff's worksite located at 488 Palisades Blvd., Birmingham, AL.

### III. STATEMENT OF THE FACTS

4. Plaintiff hereby incorporates by reference each of the allegations contained in paragraphs 1 through 3 above.

5. Defendant hired Plaintiff on or about August 19, 2012.

6. Defendant employed Plaintiff as a Program Director of General Education in its facility located at 488 Palisades Blvd., in Birmingham, Alabama.

7. Later, Defendant promoted Plaintiff to Senior Program Director in the Allied Health programs in its facility located at 488 Palisades Blvd., in Birmingham, Alabama.

8. During the time that Plaintiff worked for the Defendant, Defendnat never issued Plaintiff write-ups for performance issues.

9. As evidenced by her performance appraisals, at all times relevant to this complaint, Plaintiff performed her job in a satisfactory or better manner.

10. Plaintiff worked more than 1,250 hours in the year prior to the events that form the basis of the complaint.

11. On or about October 15, 2015, Plaintiff suffered a miscarriage.

12. Defendant employed Joseph Lucero.

13. Defendant employed Joseph Lucero in the position of Manager.

14. The same day that Plaintiff discovered that she had miscarried her baby, she informed her manager, Joseph Lucero, of the situation and her need to take a few days off from work to recover.

15. A few days later, Plaintiff had a surgical procedure related to the miscarriage.

16. Plaintiff spent at least three days convalescing from the miscarriage and surgical procedure.

17. Defendant did not offer Plaintiff Family and Medical Leave.

18. On or about February 15, 2016, Plaintiff learned that she was pregnant again.

19. In March of 2016, Plaintiff began having complications with her pregnancy.

20. Plaintiff's doctor determined that the pregnancy was high-risk and that there was a strong possibility that she would need to be placed on bed rest.

21. Defendant employed Jennifer Caldwell.

22. Jennifer Caldwell served as Defendant's Regional Human Resources Manager.

23. After she learned that the pregnancy was high-risk, Plaintiff informed Caldwell that she would likely need to take time off from work in the future for health reasons related to her pregnancy.

24. After a several weeks delay, Caldwell told Plaintiff that she would need to apply to the Company's third party FMLA administrator, FMLA Source.

25. Plaintiff began experiencing symptoms of high blood pressure in March or April of 2016 and requested a modified work schedule.

26. Plaintiff's doctor filled out the paperwork that Defendant provided and sent it to FMLA Source, as requested.

27. FMLA Source approved a modification of Plaintiff's work schedule and Plaintiff began working from home in May of 2016.

28. Defendant employed Khaled Sakalla.

29. Khaled Sakalla served as President of Virginia College Online while employed by Defendant.

30. Prior to FMLA approval, Sakalla told Plaintiff that if she took FMLA leave, it would present a problem for the company.

31. Since Sakalla told her that taking FMLA leave would present a problem, Plaintiff did not use any of the FMLA leave that she was due; instead Plaintiff completed her work from her home.

32. Thereafter, Plaintiff performed each and every function of her position from home.

33. On or about August 6, 2016, Plaintiff gave birth to her son two months before her expected due date.

34. Plaintiff stayed in the hospital for five days to receive post-natal care.

35. During the time she stayed in the hospital, Plaintiff continued to perform the functions of her job.

36. Plaintiff already had intermittent leave approved through her son's original due date and used that leave on an intermittent basis to attend to her son's medical needs.

37. Defendant never approved any continuous leave to allow Plaintiff to care for herself or to bond with her premature son.

38. As such, Plaintiff never took any continuous FMLA for the birth of her son.

39. Instead of providing her FMLA leave, Defendant placed Plaintiff on the same modified schedule that provided that she work from home instead of coming in to the office.

40. In September 2016, Plaintiff received a call from Jennifer Caldwell, who told her that Defendant was going to dock her pay because she did not complete FMLA paperwork.

41. Plaintiff protested because she had never taken any unpaid FMLA days off related to the pregnancy.

42. Plaintiff had taken only a few paid vacation days following the birth of her son and immediately returned to working for Defendant.

43. Nevertheless, Plaintiff submitted additional FMLA paperwork to cover the vacation days that she used following the birth of her son.

44. In late September of 2016, Sakalla again began to pressure Plaintiff to come to work in the office.

45. Plaintiff's son's premature brain resulted in a diminished immune system, which meant that he could not attend day care outside of the home.

46. Due to her son's serious health condition, Plaintiff could not return to work in the office because she needed to care for her son's serious health condition.

47. Plaintiff again requested FMLA leave to care for her son's medical needs.

48. Sakalla told Plaintiff that he needed her to come in to work and he did not want her to take the full FMLA leave to which she was entitled.

49. Sakalla pressured Plaintiff to return to work without taking the FMLA leave that she was entitled to.

50. Plaintiff agreed to return to work in the office on the condition that she be allowed to take her lunch break at the end of the day so that she could relieve the baby sitter who cared for her premature son.

51. Shortly after Plaintiff returned to working in the office, Sakalla began to scrutinize her time in the office.

52. Plaintiff was an exempt employee who was paid for the job that she did and not the hours that she worked.

53. Other exempt employees who had not requested FMLA leave, were not scrutinized in the same manner.

54. After she returned to work in the office, Plaintiff began taking time off to attend doctor's appointments related to her son's prematurity.

55. Although Plaintiff was allowed to take time off for the appointments, in February 2017, Sakalla told Plaintiff that she was taking too much time off for her son's appointments.

56. During a meeting with Plaintiff in February 2017, Sakalla told Plaintiff that he never had any need to take any time off to take care of his children because his wife did not work.

57. Sakalla further stated that he did not care about Plaintiff's personal life.

58. Despite the fact that Plaintiff was completing all of the functions of her job and working over 50-60 hours weekly while taking time to care for her child,

7

Sakalla continued to pressure Plaintiff about the amount of time she spent in the office.

59. Plaintiff overhead Sakalla instructing a colleague to begin monitoring Plaintiff's comings and goings from the office.

60. In May 2017, Plaintiff requested leave from Sakalla to treat recurring urinary tract infections that were causing sepsis.

61. Defendant employed Nancy O'Neal.

62. Nancy O'Neal was hired by Defendant to work in its Human Resources Department.

63. Sakalla told Plaintiff that he would have to talk to Nancy O'Neal and get back to her.

64. Plaintiff called O'Neal to discuss the leave she was requesting.

65. During the conversation O'Neal told Plaintiff that she needed to regain Sakalla's trust because she had taken a lot of vacation and sick time related to her son's serious health conditions.

66. On or about July 19, 2017, Plaintiff was involved in a car accident that caused a neck injury and seizure disorder.

67. On or about July 19, 2017, Plaintiff asked Sakalla whether she needed to take FMLA leave or short-term disability to recover from the accident.

68. Sakalla said that he would have to talk to Defendant's Human Resources Department.

69. Plaintiff never received paperwork to apply for FMLA leave for the accident.

70. On or about August 22, 2017, Plaintiff had a doctor's appointment in an effort to obtain a diagnosis for the symptoms that she had been having since her accident.

71. While she was at the appointment, Plaintiff was diagnosed with Strep Throat.

72. The next day, August 23, 2017, Plaintiff returned to work and told Sakalla that she would remain at work, but that she had Strep Throat.

73. Plaintiff then said that she would stay in her office so as not to expose anyone else to her contagious condition.

74. After Plaintiff told Sakalla that she would be in her office, he came to her office and told Plaintiff that she had two choices, he could write her up, give her a performance improvement plan and fire her, or she could quit.

75. Plaintiff responded that Sakalla could just consider it her two weeks' notice and later provided a written notice.

76. Plaintiff then began to pack her belongings.

77.  Later that same day, Sakalla told Plaintiff that her services were not needed and that she should leave the premises immediately.

## IV. COUNT ONE - FMLA INTERFERENCE

78.  Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 77 above as if fully set forth herein.

79.  During the 12-month period prior to October 15, 2015, Defendant employed Plaintiff for at least 1,250 hours of service.

80.  Defendant employs fifty (50) or more persons for each working day during each of the 20 or more calendar workweeks in the current or preceding calendar year of Plaintiff's October 15, 2015, health issues related to pregnancy.

81.  During the week of October 15, 2015, Defendant employed fifty or more employees, worked within 75 miles of the location where Plaintiff worked.

82.  On October 15, 2015, Plaintiff provided notice of unforeseeable FMLA leave to Joseph Lucero, Khaled Sakalla, and Jennifer Caldwell.

83.  Plaintiff provided notice of her unforeseeable need of FMLA leave the same day that the need for FMLA leave arose.

84.  Prior to October 15, 2015, Plaintiff had never previously informed Defendant of the need for FMLA leave.

85.  Defendant failed to provide Plaintiff with a Notice of Eligibility and Rights and Responsibilities form.

86. Defendant failed to provide Plaintiff with a FMLA Designation Notice form.

87. Defendant failed to provide Plaintiff with a FMLA Certification of Health Care Provider for Employee's Serious Health Condition form or a FMLA Certification of Health Care Provider for Family Member's Serious Health Condition form.

88. Defendant interfered with Plaintiff's FMLA rights by not allowing her to commence leave.

89. On August 23, 2017, Defendant threatened to immediately terminate Plaintiff's employment without explanation.

90. Defendant's employees had knowledge that Plaintiff suffered from FMLA qualifying conditions for which she needed treatment through her doctor from October 15, 2015 until August 23, 2017.

91. Defendant intentionally interfered with Plaintiff's exercise of her rights under the FMLA.

92. As a result of Defendant's interference with Plaintiff's rights under the FMLA, Plaintiff has been damaged, suffering loss of pay and benefits.

V. **COUNT TWO - FMLA RETALIATION**

93. Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 92 above as if fully set forth herein.

94. During the 12-month period prior to October 15, 2015, Defendant employed Plaintiff for at least 1,250 hours of service.

95. Defendant employs fifty (50) or more persons for each working day during each of the 20 or more calendar workweeks in the current or preceding calendar year prior to October 15, 2015.

96. During the week of October 15, 2015, Defendant employed fifty or more employees, worked within 75 miles of the location where Plaintiff worked.

97. On October 15, 2015, Plaintiff provided notice of unforeseeable FMLA leave to Joseph Lucero, Khaled Sakalla, and Jennifer Caldwell.

98. Plaintiff provided notice of her unforeseeable need of FMLA leave as soon as practicable due to her medical emergency.

99. Prior to October 15, 2015, Plaintiff had never previously informed Defendant of a need for FMLA leave.

100. Defendant willfully failed to provide Plaintiff with a Notice of Eligibility and Rights and Responsibilities form.

101. Defendant willfully failed to provide Plaintiff with a FMLA Designation Notice form.

102. Defendant willfully failed to provide Plaintiff with a FMLA Certification of Health Care Provider for Employee's Serious Health Condition form.

103. Defendant terminated Plaintiff's employment on August 23, 2017.

104. Defendant's employees had knowledge that Plaintiff suffered from FMLA qualifying conditions for which she needed treatment through her doctor from October 15, 2015, until August 23, 2017.

105. Defendant's President of Virginia College Online, Khaled Sakalla, informed Plaintiff that Defendant terminated her employment.

106. Defendant's employee, Khaled Sakalla, made the decision to terminate Plaintiff's employment.

107. Defendant's manager, Khaled Sakalla, made the decision to terminate Plaintiff's employment, in whole or part, because of Plaintiff's exercise of FMLA rights.

108. On August 23, 2017, Defendant terminated Plaintiff's employment without explanation.

109. As a result of Defendant's retaliatory termination decision in violation of the FMLA, Plaintiff has been damaged, suffering loss of pay and benefits.

## VII. **PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief:

A.   Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the

Defendant and at the Defendant's request from continuing to violate the terms of the Family Medical Leave Act;

B.   Enter an Order requiring the Defendant to make Plaintiff whole by awarding her reinstatement to the position she would have had, had she not been terminated; and,

C.   Award Plaintiff back pay, together with employment benefits, front pay, nominal damages, special damages, liquidated damages, compensatory damages, attorneys' fees and costs, and any additional relief or equitable relief as may be determined by the Court to which Plaintiff is entitled.

_____
Allen D. Arnold

_____
Kira Fonteneau

_____
Angelica Rose Agee

OF COUNSEL
Fonteneau & Arnold LLC
2151 Highland Avenue South, Suite 205
Birmingham, Alabama 35205
T: 205.252.1550 F:205.502.4476

**PLEASE SERVE DEFENDANT(S) AT:**
EDUCATION CORPORATION OF AMERICA
NATIONAL REGISTERED AGENTS, INC.
2 NORTH JACKSON STREET SUITE 605
MONTGOMERY, AL 36104

PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

PLAINTIFF DEMANDS TRIAL BY STRUCK JURY